Anthony G. TRIPONI

v.

The UNITED STATES

No. 55–78.

United States Court of Claims.

July 16, 1980.

Edward J. Swan, New York City, attorney of record, for plaintiff.

Frank M. Rapoport, Washington, D. C., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D. C., for defendant.

Before DAVIS, NICHOLS and KASHIWA, Judges.

## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge:

Plaintiff, a preference eligible, served as a criminal investigator with the Drug Enforcement Agency (DEA) from July 1973 until November 1975. At that time, he was reassigned within DEA to the position of intelligence analyst, at the same GS grade and salary level as the criminal investigator job he had previously held, but without the opportunity to earn premium pay for overtime work. The reassignment was instituted by DEA after plaintiff was diagnosed as having a manic–depressive condition resulting in hyperactivity and disorientation. The doctors who examined plaintiff found him fit to return to active duty (since his illness was correctable through treatment with the drug lithium). However, DEA's medical officer made a recommendation, based on a number of factors, that plaintiff be reassigned to a less stressful job which did not require long hours or the carrying and use of a weapon, and DEA acted on this advice.

In February of 1976, plaintiff sought, through administrative channels, to invalidate the reassignment. The DEA rejected plaintiff's attempt to reverse the reassignment decision because he had not followed agency grievance procedures within the prescribed time limits, as set forth in Ad-

ministrative Manual Chapter 06 § 0674.91, and because, after a review of the merits of the Regional Office decision by appropriate Headquarters officials, the reassignment was affirmed. In July of 1976, plaintiff appealed the agency action to the Federal Employee's Appeal Authority (FEAA) of what was then the Civil Service Commission (CSC). The FEAA found that it had no jurisdiction over plaintiff's appeal since, although he had lost the opportunity to earn annual premium pay, he had suffered neither a reduction in pay nor rank, and therefore, his reassignment was not an adverse action. The CSC's Appeals Review Board subsequently denied plaintiff's appeal of the FEAA decision, and in 1978, plaintiff brought suit in this court.

Defendant then filed the summary judgment motion which is now before us, on the grounds that: (1) the FEAA's finding that the reassignment was not an adverse action was neither arbitrary nor capricious; and (2) the reassignment was not an abuse of DEA's discretion. Plaintiff has not filed a cross-motion, but has opposed defendant's motion, contending that there are material issues of fact as to both of plaintiff's arguments, and that therefore summary judgment is inappropriate.

■ In order for the procedural rights attendant on an adverse action to be applicable, an employee must show that at least one of a number of actions has been taken by the agency involved. In this case, plaintiff argues that his reassignment was a reduction in rank [1] and pay, and that it was

therefore an adverse action. *See*, F.P.M. Supp. Part 752–1 §§ S1–1, 4, 5.

■ Plaintiff's argument that a reduction in pay has occurred, is premised on his loss of premium pay for administratively uncontrollable overtime under 5 U.S.C. § 5545(c)(2). Such premium pay is applicable to criminal investigator positions but not to intelligence analyst positions. The FEAA found that plaintiff was not "reduced in pay" as a result of the change in jobs, because it determined that, under the applicable regulations and statutes, premium pay under 5 U.S.C. § 5545(c)(2) was not within the scope of "pay" for reduction–in–pay purposes.

The phrase "reduction in pay" is not specifically defined by statute or regulation, but definitions of "pay" and "rate of basic pay" in the Federal Personnel Manual and the Code of Federal Regulations provide guidance in interpreting that term. For example, the Manual states that

> In law and the Commission's regulations, the term *pay means the rate of basic pay* of an employee * * *. *Basic pay ordinarily does not encompass extra or additional payment* for special duty such as night work, *overtime*, hazardous duty or holiday work.

[F.P.M. Supp. Part 752–1 § S1–5(a) (emphasis added)].

*See also*, 5 C.F.R. § 550.103(j) (rate of basic pay is exclusive of additional payment of any kind). Since premium pay under section 5545(c)(2) is additional compensation for overtime duty,[2] it falls outside of the

---

1. Plaintiff raised this issue of reduction in rank in his petition, but has not pressed it in his argument. We agree with defendant that there was no reduction in rank as a result of plaintiff's reassignment. Plaintiff's salary and grade remained the same before and after the reassignment, and this is the overriding criterion in determining comparability of positions in a reassignment. *Comberiate v. United States*, 203 Ct.Cl. 285, 289 (1973). We need not consider any subjective and speculative loss of esteem within DEA in determining whether there was a reduction in rank. *See, Long v. United States*, Ct.Cl. No. 582–77 at 5, 618 F.2d 120 (Order of March 20, 1979). Nor is it relevant that plaintiff's reassignment resulted in loss of liberal retirement rights, because F.P.M.Supp.

Part 752–1 § S1–4(c)(6) provides that reassignment from a position having more liberal retirement provisions for hazardous work (such as criminal investigator positions) to one in which they do not apply, is not a reduction in rank. Also, there is no showing that plaintiff lost hierarchical rank within DEA. We therefore find that since plaintiff has made no showing of a lowering of his relative standing within DEA, *see*, F.P.M.Supp. Part 752–1 § S1–4(a), the Commission acted within its discretion in deciding that no reduction in rank had occurred.

2. Under 5 U.S.C. § 5545(c)(2), an agency may provide that:

> *   *   *   *   *   *

definitions of pay referred to above, and its loss would therefore not mean a "reduction" in pay.

Further, the F.P.M. provides that an adverse action occurs when there is "[a] reduction or discontinuance of premium pay under 5 U.S.C. § 5545(c)(1), e. g. firefighters." F.P.M.Supp. Part 752–1 § S1–5(b)(8).[3] However, the F.P.M. does not consider the loss of administratively uncontrollable overtime under section 5545(c)(2)–for a person such as a criminal investigator–to be a reduction in pay triggering adverse action procedures.

Plaintiff contends that there is a question of material fact as to whether the loss of premium pay is a reduction in pay. His position is that the CSC has decided to treat a loss of premium pay under section 5545(c)(1) as an adverse action, id., but has incorrectly declined to do so for loss of premium pay under section 5545(c)(2). The material fact is asserted to be whether there are actual differences between premium pay under these two sections which make it reasonable to consider loss of one, but not loss of the other, to be an adverse action. While plaintiff designates this as a factual issue, we find that no issue of material fact exists, and that the legal question should be decided in defendant's favor.

There are several significant differences between the two types of premium pay included in section 5545(c). Under section 5545(c)(1) the employee receives premium pay for overtime required to be spent at the station, a large portion of which consists of being on standby status. 5 C.F.R. § 550.141. In order to qualify for annual premium pay, this "standby overtime" must be required of the employee, and the hours must be part of a regularly established, pre–set time schedule. The overtime requirement may not be occasional, irregular, or for a brief period. 5 C.F.R. § 550.143(a). Firefighters who must man a station 24 hours a day, but need not be working during that time, are an example of employees who may receive this type of premium pay.

Administratively uncontrollable overtime under section 5545(c)(2), on the other hand, applies where hours of duty may not be administratively controlled, and where substantial amounts of irregular or occasional overtime is worked at the discretion of the employee. 5 C.F.R. § 550.151. An example of this type of work is that of "an investigator of criminal activities whose hours of duty are governed by what criminals do and when they do it." 5 C.F.R. § 550.153(a).

(2) an employee in a position in which the hours of duty cannot be controlled administratively, and which requires substantial amounts of irregular, unscheduled, overtime duty with the employee generally being responsible for recognizing, without supervision, circumstances which require him to remain on duty, shall receive premium pay for this duty on an annual basis instead of premium pay provided by other provisions of this subchapter, except for regularly scheduled overtime, night, and Sunday duty, and for holiday duty. Premium pay under this paragraph is determined as an appropriate percentage, not less than 10 percent nor more than 25 percent, of such part of the rate of basic pay for the position as does not exceed the minimum rate of basic pay for GS–10, by taking into consideration the frequency and duration of irregular unscheduled overtime duty required in the position.

3. Pursuant to 5 U.S.C. § 5545(c)(1), an agency may provide that

(1) an employee in a position requiring him regularly to remain at, or within the confines of, his station during longer than ordinary periods of duty, a substantial part of which consists of remaining in a standby status rather than performing work, shall receive premium pay for this duty on an annual basis instead of premium pay provided by other provisions of this subchapter, except for irregular, unscheduled overtime duty in excess of his regularly scheduled weekly tour. Premium pay under this paragraph is determined as an appropriate percentage, not in excess of 25 percent, of such part of the rate of basic pay for the position as does not exceed the minimum rate of basic pay for GS–10 (or, for a position described in section 5542(a)(3) of this title, of the basic pay of the position), by taking into consideration the number of hours of actual work required in the position, the number of hours required in a standby status at or within the confines of the station, the extent to which the duties of the position are made more onerous by night, Sunday, or holiday work, or by being extended over periods of more than 40 hours a week, and other relevant factors * * *.

Plaintiff recognizes that, if these differences actually existed, the CSC would have a valid basis for distinguishing between these two types of premium pay, but, according to plaintiff, these differences do not exist in reality. Despite numerous regulations and statutes [4] dealing with these different types of premium pay in different ways, plaintiff relies solely on his own affidavit to support his position that there are no real differences between them. Even if we take the statements in plaintiff's affidavit which are based on personal knowledge as true,[5] they do not justify a finding that a material issue of fact exists.

■ Plaintiff's affidavit emphasizes that he worked in excess of 120 hours a quarter overtime regularly but was paid only for 120 hours, which sum was automatically included in his paycheck. He states that his job offer included an amount for annual premium pay even though at that time he had worked no overtime. These statements do not support plaintiff's position that there are no differences between administratively controllable and uncontrollable overtime under section 5545(c). The fact that plaintiff worked over 120 hours per quarter, but was only paid for 120 hours, is a result mandated by the language of section 5545(c)(2) which limits premium pay to 25% of the employee's basic pay. Thus, since plaintiff alleges that he regularly worked in excess of 120 hours overtime a quarter, his paycheck would properly reflect the maximum amount of premium pay. However, if he had worked a lesser amount of overtime the statute would have limited his premium pay accordingly. Pursuant to 5 C.F.R. § 550.161(f), DEA was not required to monitor the exact number of hours worked each pay period, but instead could review and adjust the percentage of premium pay at appropriate intervals. The fact that the job offer included premium pay was proper in light of the regulation then in effect which automatically credited an employee with a certain amount of premium pay for the first 12 pay periods, *see*, Department of Justice Order 1551.4A (Aug. 1, 1975) and DEA Administration Manual § 0542.53A(2) (Mar. 3, 1971), and does not mean that it would not have been adjusted downward had plaintiff's overtime work actually been less than the 25% maximum.

Thus, plaintiff was properly paid for his overtime, and his payment was consistent with the differences in the type of overtime worked by criminal investigators and firefighters. Plaintiff makes no showing that his hours were predetermined by management as firefighters' are.

■ Plaintiff's affidavit also states that he was required to work over 120 hours of overtime and failure to do so would result in a poor fitness rating. The statutes and regulations make clear that the overtime required would be irregular and dependent on the work being performed. *See, e.g.* 5 U.S.C. § 5545(c)(2); 5 C.F.R. § 550.151, *et*

---

4. 5 C.F.R. § 550.163(d) (1976) provides that premium pay under regulations implementing sections 5545(c)(1) or (2) will be included in basic pay for certain purposes. This requirement is derived from certain statutes, *i. e.* 5 U.S.C. §§ 5595(c) (severance pay), 8704(c) (life insurance), and 8114(e) (compensation for injuries) which provide that section 5545(c)(1) pay is basic pay for purposes of those statutes, and language in 5 U.S.C. § 8331(3)(C) and (D) which provides that both types of premium pay are basic pay for civil service retirement purposes. Plaintiff interprets section 550.163(d) (1976) to mean that both types of premium pay are treated the *same for all* of these statutory benefit programs, but that is incorrect. The language in these statutes clearly applies only to section 5545(c)(1) pay, with the sole exception of retirement. It is because of the retirement statute's inclusion of both types of premi-

um pay as basic pay that section 550.163(d)(2) (1976) *refers to premium pay under sections* 5545(c)(1) *and* 5545(c)(2).

5. We need not, and do not accept as true, those statements in plaintiff's affidavit which are insufficient under Court of Claims Rule 101(f) as not being based on personal knowledge of plaintiff. This is especially true where the statements are contradicted by the affidavits of officials in DEA and CSC whose duties include administration of the pay policies at issue. For example, plaintiff states that Department of Justice policy *requires* that *all* criminal investigators work at least 120 hours of overtime a quarter. This is not within plaintiff's competence and is contradicted by the applicable regulations and defendant's affidavits.

*seq.* The fact that a poor fitness rating might result if sufficient overtime to properly perform a job was not worked does not mean that a certain amount of overtime was required, and is clearly distinguishable from the situation under section 5545(c)(1) where firefighters are absolutely required to be at the station for certain set hours as a pre-established management-controlled job requirement, and presumably may be fired if they are absent without permission. Discretion as to when and how many hours are worked is present for criminal investigators and absent for firefighters. In addition, this is at least partially a matter outside plaintiff's personal knowledge and is contradicted by defendant's affidavits. *See note 5, supra.*

■ The foregoing discussion highlights only some of the many distinctions between the two types of premium pay under section 5545(c), and shows that CSC had ample grounds for treating them differently for adverse action purposes. We therefore find that the FEAA was acting within its discretion in refusing to hear plaintiff's appeal, and we uphold their decision.

■ Plaintiff argues that, even if we find no issue of fact regarding whether the FEAA properly denied plaintiff's appeal, there is still a question of fact as to whether his reassignment constituted a statutory violation, and was therefore an abuse of discretion. To support this position, he relies on 5 U.S.C. § 3351 (1978). Under section 3351, an agency must waive physical requirements in determining job qualifications for *transfers* of preference eligible employees if, "in the opinion of the Office [of Personnel Management] or other examining agency, after considering the recommendation of an accredited physician, the preference eligible is physically able to perform efficiently the duties of the position." (emphasis added). Plaintiff argues that DEA has imposed on him a physical re-

quirement that he not have the chemical imbalance which caused his manic-depressive illness, and that this requirement is in violation of section 3351. This argument involves a legal, rather than a factual issue, and we find, as a matter of law, that the statute is inapplicable to plaintiff.

Section 3351 does not apply to plaintiff because he was reassigned, not transferred. For purposes of administering the civil service laws, "transfer" has been defined to mean "a change of an employee * * * from a position in one agency to a position in another agency," 5 C.F.R. § 210.102(18), while "reassignment" means "a change of an employee, while serving continuously within the same agency, from one position to another * * *." 5 C.F.R. § 210.-102(12). Since both jobs held by plaintiff were within DEA, his job change was a reassignment, and no section 3351 transfer occurred. Therefore, we need not reach the question of whether, if plaintiff's switch of jobs was actually a transfer, it would have violated the terms of that statute.

■■ Since section 3351 is not relevant to this case, our review of the reassignment is limited to determining whether DEA acted in bad faith or abused its discretion in reassigning plaintiff. *See, Cook v. United States,* 210 Ct.Cl. 368, 374, 536 F.2d 365, 368–69 (1976). Agencies have wide discretion in reassigning employees, *see Comberiate, supra,* 203 Ct.Cl. at 288; *Urbina v. United States,* 192 Ct.Cl. 875, 880–81, 428 F.2d 1280, 1284 (1970); 5 C.F.R. § 335.102, and, "particularly where medical questions are involved * * *"[6] and are supported by substantial evidence, we will not substitute our judgment for that of the agency. *Cook, supra,* 210 Ct.Cl. at 374, 536 F.2d at 369. We must therefore affirm the reassignment at issue, if we find that DEA did not act in bad faith or in abuse of its discretion.

---

**6.** Plaintiff contends that *Cook* is inapplicable here because, in that case, at least one of the other doctors agreed with the chief medical officer's decision to involuntarily retire the serviceman involved. While the facts of this case are not exactly the same as in *Cook,* the legal analysis in that case, requiring broad discretion where medical judgments are involved, is directly applicable here.

DEA made its decision to reassign plaintiff after a long and careful analysis of plaintiff's illness and his ability to carry out his criminal investigator duties. Prior to his reassignment, plaintiff was placed on limited–duty status and was examined by several physicians. His symptoms of hyperactivity and disorientation were diagnosed as manic–depressive illness. These symptoms were determined by the examining doctors to be correctable through drug therapy involving lithium treatments. The doctors who examined plaintiff felt that his illness was fully correctable and unlikely to recur as long as the maintenance dosages of lithium were continued and periodic psychiatric examinations were given. They therefore recommended that plaintiff be returned to full active duty.

The chief medical officer determined that, despite the above recommendations and the fact that the fitness–for–duty examination did not find psychiatric impairment, plaintiff should be reassigned to a position which did not "require the carrying or potential use of weapons [and] that he not be placed in emotionally 'pressurized' circumstances, or those with great potential for creating hazardous or imminently dangerous situations." The medical officer's reasons for reaching this decision were:

(1) The very seriousness and chronicity of the "clear" diagnosis;

(2) the impression that the man is not "cured";

(3) the clear implication that the employee's proper functioning is dependent upon his own recognition of a recurrence of symptoms, i.e. relapse, and then reinstituting drug therapy; and

(4) the doctor's opinion being predicated upon an annual psychiatric review.

Plaintiff was subsequently reassigned to an intelligence analyst position, the duties of which were consistent with the medical officer's recommendations.

■ The decision to reassign plaintiff was within DEA's broad discretion, and was not undertaken for any improper purpose. While a different result might have been reached on the basis of the examining doctor's findings as to fitness–for–duty, we cannot substitute our judgment for that of DEA without a finding of lack of substantial evidence, abuse of discretion or bad faith, see Cook, supra, 210 Ct.Cl. at 374, 536 F.2d at 369, and we find none of these factors in the instant decision.

The record discloses that the chief medical officer carefully considered the evaluations given by the other doctors, but that in his judgment they had not taken sufficient account of the stress and potential for danger incident to performing the particular duties of a criminal investigator. He was clearly concerned, not with arbitrarily depriving plaintiff of premium pay and the other benefits of being a criminal investigator, but rather with preserving the safety of the public and the plaintiff himself. In particular, the fact that plaintiff would be carrying and possibly using a weapon, created a situation in which there was a great need for caution and careful scrutiny in determining plaintiff's fitness to effectively and safely carry out his duties. Moreover, plaintiff could forget or neglect to take the necessary medicine and thereby place himself in the very same situation from which he had to be removed. The decision to reassign plaintiff was made only after a long process of examinations and evaluations, and in light of all the circumstances, we find no showing of any "demonstrable impropriety" in DEA's decision. See Cook, supra, 210 Ct.Cl. at 374, 536 F.2d at 369.

Accordingly, we grant defendant's motion for summary judgment. The petition is dismissed.